**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| T.D.P., an individual,<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>**CHOICE HOTELS INTERNATIONAL,<br>INC.**<br><br>　　　　　Choice. | Case No. 22-cv-3837<br><br>**JUDGE** _____<br>Related Cases: No. 19-cv-849<br>　　　　　　　No. 21-cv-4933<br>　　　　　　　No. 21-cv-4934<br>　　　　　　　No. 21-cv-4935<br>　　　　　　　No. 21-cv-5022<br>　　　　　　　No. 22-cv-1924<br>　　　　　　　No. 22-cv-2682<br>　　　　　　　No. 22-cv-2683<br>　　　　　　　No. 22-cv-2690<br>　　　　　　　No. 22-cv-2734<br>　　　　　　　No. 22-cv-3185<br>　　　　　　　No. 22-cv-3202<br>　　　　　　　No. 22-cv-3203<br><br>**DEMAND FOR JURY TRIAL** |

## COMPLAINT

COMES NOW, the Plaintiff T.D.P. ("Plaintiff" or "T.D.P."), by and through her undersigned counsel, and respectfully submits her complaint for damages and makes the following averments.

### INTRODUCTION

1.　　Plaintiff T.D.P. is a survivor of human sex trafficking.

2.　　T.D.P.'s life story reads like a tragedy wherein she was forced to endure violence, trauma, exploitation, manipulation, threats, isolation, humiliation, and degradation.

3.　　T.D.P. met a person that groomed her into trafficking. Ultimately—her trafficker— came to control every aspect of her life. The defining factor of the relationship between T.D.P. and

1

her trafficker, was that each trafficker working together, forced T.D.P. to have sex with men for money.

4.      T.D.P. was trafficked in hotels owned by Choice Hotels International, Inc. ("Choice"). T.D.P. and her trafficker rented hotel rooms for one purpose—a location to engage in sex trafficking.

5.      At Choice's hotels, T.D.P. was forced to engage in sex with many men every day. Every new customer was another instance T.D.P. was forced to have sex against her will—that is to say, T.D.P. was raped multiple times per day by multiple men when she stayed at Choice's hotels.

6.      T.D.P.'s trafficker forced her onto Choice's properties where she was repeatedly raped and forced to perform commercial sex acts with "buyers" under threats of physical and psychological abuse.

7.      At some point, T.D.P. was able to escape the grasps of her trafficker and the prison of Choice's hotel rooms.

8.      T.D.P. has spent a considerable amount of time attempting to regain the life that was stripped away from her as a result of her trafficking.

9.      T.D.P. brings this lawsuit in an attempt to hold Choice, who imprisoned her, accountable for their role in her trafficking.

## OVERVIEW OF TRAFFICKING

10.      A significant portion of all sex trafficking in the United States of America occurs within the hospitality industry at hotels and motels.

11.      For decades, sex traffickers have brazenly operated in and out of hotels throughout this country. Traffickers paraded throughout hotels, while hospitality giants stood on the sidelines

and did nothing. Instead, hotels and motels paid only lip service to campaigns against sex trafficking and stood by collecting millions in profits from the trafficking occurring on their properties.

12.     Choice knew and should have known for decades that sex trafficking repeatedly occurs under its brand flags.

13.     Rather than taking timely and effective measures to stop profiting from this epidemic, Choice chose to ignore the open and obvious presence of sex trafficking on their branded properties, benefitting from the profit and fees created by rooms rented and Wi-Fi provided for this explicit and apparent purpose.

14.     The sex trafficking industry alone pulls in an estimated $99 billion each year, making it the second largest illicit trade after the sale of all illegal drugs.[1] However, traffickers aren't the only profiteers. The hotel industry, including Choice, makes millions from participating in ventures that they know or should have known engage in violations of 18 U.S.C. § 1591(a) through renting rooms where sex trafficking victims are harbored night after night and providing Wi-Fi that traffickers use to advertise and solicit victims for commercial sex. Choice and traffickers have a mutually beneficial relationship, fueled by the sexual exploitation of victims.

15.     The hotel industry ignored human trafficking on their premises, thereby enabling human trafficking in the United States to flourish.

16.     Choice and other members of the hospitality industry are and have long been aware of the prevalence of human trafficking, particularly sex trafficking, at hotels in general and at Choice's own properties worldwide. Choice and others in the industry have access to much public

---

[1] *Profits and Poverty: The Economics of Forced Labor,* INTERNATIONAL LABOR ORGANIZATION (2017), https://www.ilo.org/global/topics/forced-labour/statistics/lang--en/index.htm.

information on the prevalence of human trafficking at hotels, including reports by the Polaris Project, among others, created for the use of the hospitality industry.

17.     The hospitality industry, speaking through industry organizations, has in recent years been increasingly vocal about its supposed "unified commitment" to combat human trafficking. Unfortunately, the near-total lack of concrete action by Choice and the rest of the hospitality industry shows that the industry in fact has a "unified commitment" to the very opposite: continuing with business as usual, so that Choice and all industry participants continue to profit millions from participating in a venture in violation of § 1591(a).

18.     Choice's decision to prioritize profits over protecting sex trafficking victims resulted in the repeated sexual exploitation and rape of T.D.P. on their properties.

19.     T.D.P., a survivor of sex trafficking, brings this action for damages against Choice pursuant to the Trafficking Victim Protection Reauthorization Act, 18 U.S.C. § 1595 and Child Abuse Victim's Rights Act, 18 U.S.C. § 2255. Choice knowingly benefitted from participation in a venture that it knew or should have known to be engaging in violations of 18 U.S.C. § 1591(a).

## PARTIES

20.     Plaintiff T.D.P. is a natural person and a resident and citizen of McDonough, Georgia.

21.     Plaintiff is a victim of trafficking pursuant to 22. U.S.C. § 7102(17) and 18 U.S.C. § 1591(a), and a victim of a "severe form of trafficking" as defined under 22 U.S.C. § 7102(16).

      a.     Due to the sensitive and intimate nature of the issues, Plaintiff T.D.P. requests that this Court grant a protective order pursuant to Fed. R. Civ. P. 26(c) to permit her to proceed under a pseudonym and to ensure that Choice

maintains the confidentiality of Plaintiff's identity throughout the pendency of this lawsuit and after.[2]

b.    Generally, under the Federal Rules of Civil Procedure, pleadings must state the name of all parties.[3] However, there are exceptions when the issues involved are of a sensitive and highly personal nature.[4] For good cause, the Court may issue an order to protect a party or person from annoyance, embarrassment, oppression or undue burden or expense.[5]

c.    Here, granting pseudonym status and proceeding under seal is warranted because this litigation will involve the disclosure of stigmatizing sexual information, including rape. Plaintiff fears the stigma from her family, friends, employer, and community if her true identity is revealed in the public record.

d.    Plaintiff should not be compelled to disclose her identity in order to maintain her privacy and safety. Plaintiff's privacy interest substantially outweighs the customary practice of judicial openness.[6]

---

[2] In cases where the plaintiffs have demonstrated a need for anonymity, the district court should use its powers to manage pretrial proceedings under Fed. R. Civ. P. 16(b), and to issue protective orders limiting disclosure of the party's name under Fed. R. Civ. P. 26(c), to preserve the party's anonymity to the greatest extent possible without prejudicing the opposing party's ability to litigate the case. *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1069 (9th Cir. 2000).

[3] Fed. R. Civ. P. 10(a).

[4] A district court must balance the need for anonymity against the general presumption that the parties' identities are public information and the risk of unfairness to the opposing party. *See, e.g., M.M. v. Zavaras*, 139 F.3d 798, 803 (10th Cir.1998); *James v. Jacobson*, 6 F.3d at 238 (4th Cir. 1993); *Doe v. Frank*, 951 F.2d 320, 323–24 (11th Cir.1992); *Doe v. Stegall*, 653 F.2d at 186 (5th Cir.); *see also Doe v. Frank* at 323 (11th Cir. 1992) (holding that a plaintiff should be permitted to proceed anonymously in cases involving matters of a highly sensitive and personal nature, real danger of physical harm, or where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity).

[5] Fed. R. Civ. P. 26(c).

[6] *Does I thru XXIII, 214 F.3d* at 1068 (joining its 4th, 5th, 10th, and 11th sister circuits in holding that a party may preserve his or her anonymity in judicial proceedings in special circumstances when the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity).

e.  Moreover, Choice will not be prejudiced. Plaintiff will agree to reveal her identity to Choice for the limited purpose of investigating Plaintiff's claims once the parties have entered into a protective order. Plaintiff simply seeks redaction of Plaintiff's personal identifying information from the public docket and assurances that Choice will not use or publish Plaintiff's identity in a manner that will compromise her safety, personal life, personal relationships, or future employment prospects.

22.  **Defendant Choice Hotels International, Inc.** ("Choice") is one of the largest hotel franchisors in the world and offers its brand public lodging services through its affiliates, subsidiaries, and franchisees. Choice is a Delaware corporation with its headquarters in Rockville, Maryland and can be served through its registered agent, United States Corporation Company, at 3366 Riverside Dr. Suite 103, Upper Arlington, OH 43221.

23.  Choice owns, supervises, manages, controls, and/or operates the Quality Inn located at 100 N Park Ct, Stockbridge, GA 30281 ("Park Quality Inn"); the Quality Inn & Suites located at 7325 Davidson Pkwy N, Stockbridge, GA 30281 ("Davidson Quality Inn"); and the Comfort Inn & Suites located at S 1221 Corporate Plaza SE, Smyrna, GA 30080 ("Smyrna Comfort Inn") (collectively, the "Choice Branded Georgia Properties").

a.  The Park Quality Inn, Davidson Quality Inn, and Smyrna Comfort Inn are Choice branded properties.[7]

b.  Choice employees work throughout the Choice Branded Georgia Properties by Choice. Choice employees work jobs including front desk and housekeeping.

---

[7] *Our Brands*, CHOICE HOTELS, https://www.choicehotels.com/about/brands (last visited Jun. 9, 26 2022).

c. Choice is the principal in an agency relationship with the Choice Branded Georgia Properties by Choice. It is both directly and vicariously liable for the acts and/or omissions of the staff at its branded hotels, including the Choice Branded Georgia Properties by Choice where T.D.P. was trafficked. The Choice Branded Georgia Properties by Choice also has apparent agency for Choice so as to establish vicarious liability, in addition to an actual agency relationship.

d. Choice controlled and dictated the actions and inactions of the Choice Branded Georgia Properties by Choice through highly specific and detailed brand standards, policies, and procedures.

e. Choice knowingly benefited, or received something of value, from its ventures at the Choice Branded Georgia Properties by Choice through royalty payments, licensing fees, and percentages of the gross room revenue generated by the hotel operations, including rates charged through rooms where T.D.P. was trafficked, as well as in maintaining a positive public images for the Choice Branded Georgia Properties by Choice. Choice also benefited from gathering personal data from the Wi-Fi it provided to customers including T.D.P. and her trafficker.

f. Choice is subject to the jurisdiction of this Court because it regularly conducts business in Ohio, including through the operation of numerous hotels in Ohio, such as the Choice Branded Georgia Properties by Choice, contracting to supply services in Ohio. Choice has derived substantial revenue from services rendered in Ohio.

7

g. Whenever reference is made in this Complaint to any act, deed, or conduct of Choice, the allegation is that Choice engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of the Choice Branded Georgia Properties by Choice.

## JURISDICTION AND VENUE

24. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 and under 18 U.S.C. § 1595 and 18 U.S.C. § 2255 because this action arises under the laws of the United States.

25. The Court has personal jurisdiction pursuant to the 18 U.S.C. § 1595, William Wilberforce Trafficking Victims Protection Reauthorization Act ("TVPRA") and 18 U.S.C. § 2255, Child Abuse Victims' Rights Act ("CAVRA").

26. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3) because the Court has personal jurisdiction over Choice.

27. Pursuant to Southern District of Ohio Local Rule 3.1(b), this case is related to Case Nos. 2:2021-cv-04935, 2:2019-cv-00849, 2:2021-cv-04933, 2:2021-cv-04934, 2:2022-cv-01924, 2:2021-cv-05022, 2:2022-cv-02682, 2:2022-cv-02683; 2:2022-cv-02690; 2:2022-cv-02734 2:2022-cv-03185; 2:2022-cv-03202; and 2:2022-cv-03203 currently pending before Chief Judge Algenon L. Marbley.

## FACTUAL BACKGROUND

### INTRODUCTION

28.     T.D.P. brings her claims against major hotel brand corporations for violations of the Trafficking Victims Protection Reauthorization Act ("TVPRA") 18 U.S.C. § 1595(a) and the Child Abuse Victim's Rights Act ("CAVRA"), 18 U.S.C. § 2255.

29.     The TVPRA prohibits Choice from profiting from any venture they know or should know involves a violation of § 1591, and thereby establishes a non-delegable duty of reasonable care.

30.     An overwhelming majority of commercial sex trafficking transactions occur within hotels and motels, as traffickers use their rooms as the hub for their operations.[8] Hotels offer anonymity and non-traceability, privacy, and discretion, making them ideal venues sex trafficking. Inside, the victims are harbored, raped, assaulted, and forced to service buyers who come to the hotel solely to purchase sex. In addition, traffickers regularly use Choice's Wi-Fi to advertise and solicit victims for commercial sex against their will.

31.     As part of its conspiracy, to save costs and continually reap millions of dollars in profits, Choice generally failed to create, adopt, implement, and enforce company-wide policies and procedures regarding human trafficking (or suspected) at the branded properties. Furthermore, Choice did not train staff how to identify and respond to suspected human trafficking, failed to require training of all employees on human trafficking policies and procedures, and failed to conduct audits confirming compliance with policies and procedures.

32.     Choice kept no reports or data on suspected incidents or occurrences of human trafficking on its properties and the rate at which those occurrences changed as a result of implementing human trafficking policies and procedures. Choice did not establish mandatory and secure reporting mechanisms at the point of sale.

---

[8] Bradley Myles, *Combating Human Trafficking in the Hotel Industry*, HUFFINGTON POST (Jul. 22, 2015), https://www.huffpost.com/entry/combating-human-trafficking-in-the-hotel-industry_b_ 7840754.

33.     With little to no risk posed to traffickers seeking to use Choice's rooms as a location to force victims like T.D.P. to engage in commercial sex against her will, the sex trade continues to thrive at Choice's branded properties while Choice reaps the benefits.

34.     Plaintiff's injuries are indivisible and cannot be separated. Plaintiff's injuries are the result of continued instances of ongoing violent traumatizing sexual exploitation.

35.     Choice is jointly and severally liable for the Plaintiff's damages in this case.

**THE SEX TRAFFICKING OF PLAINTIFF T.D.P.**

36.     T.D.P. was kidnapped by her trafficker when she was just seventeen (17) years old.

37.     By means of a combination of force, coercion, violence, threats, manipulation, compelled use of and dependency on illegal substances, control over identification documents and possessions, and deprivation of basic survival necessities such as, but not limited to, food, water, transportation, shelter, and clothing, T.D.P. was held captive and sold for sex by her trafficker.

38.     During the time that she was trafficked, T.D.P.'s trafficker frequently rented rooms at the Choice Branded Georgia Properties because the rooms provided convenient, anonymous, and relatively central locations for "johns" that would pay to engage in sex with T.D.P.

39.     Throughout her trafficking, T.D.P.'s trafficker connected with "johns" by posting or causing to be posted advertisements on Backpage advertising for T.D.P.'s availability for commercial sex. T.D.P's trafficker posted many of these advertisements and had conversations with "johns" while connected to Choice's Wi-Fi.

40.     T.D.P. was forced to have sex with multiple "johns" every day she was trafficked in the Choice Branded Georgia Properties.

41.     From approximately March to April 2018, while under the coercive control of trafficker, T.D.P.'s was imprisoned in hotel rooms rented by her trafficker and forced her to have sex for money. During that time, T.D.P. was trafficked at the Choice Branded Georgia Properties:

      a. Park Quality Inn located at 100 N Park Ct, Stockbridge, GA 30281;

      b. Davidson Quality Inn located at 7325 Davidson Pkwy N, Stockbridge, GA 30281; and

      c. Smryna Comfort Inn located at S 1221 Corporate Plaza SE, Smyrna, GA 30080.

42.     While at Choice's hotels, T.D.P.'s trafficker violently attacked and beat her, and psychologically tormented her by withholding food and water, all to ensure that she could not escape.

43.     During the time she was trafficked, T.D.P.'s trafficker constantly shuffled her back and forth among the Choice Branded Georgia Properties, often visiting the same hotels repeatedly at intervals.

44.     During her captivity at Choice's hotels, T.D.P. was raped, continuously abused physically and verbally, malnourished, psychologically tormented, kidnapped, and imprisoned at the Choice Branded Georgia Properties.

45.     At the Choice Branded Georgia Properties, T.D.P. encountered the same staff on multiple occasions. Choice's staff would have seen the signs of T.D.P.'s deterioration brought on by the abuse perpetrated by her trafficker, including bruising and verbal abuse occurring in public areas of the Choice Branded Georgia Properties as well as signs of malnutrition and poor health.

46.     Every time T.D.P. interacted with Choice's staff, it was readily apparent that T.D.P. was under the control of her trafficker. T.D.P.'s trafficker, who was significantly older than T.D.P., checked in to Choice's without the employees requiring him to show an identification documents.

47.     T.D.P.'s trafficker followed a repetitive and routine procedure during stays at the Choice Branded Georgia Properties to which Choice's knew or should have known of T.D.P.'s trafficking because of a variety of factors detailed below:

### THE SEX TRAFFICKING OF T.D.P. AT PARK QUALITY INN

48.     Plaintiff T.D.P. was subjected to sex trafficking at the Choice branded, Park Quality Inn located at 100 N Park Ct, Stockbridge, GA 30281.

49.     Plaintiff and her trafficker stayed at the Park Quality Inn by Choice from approximately March to April 2018, staying twice a week during that period.

50.     At the Park Quality Inn by Choice, T.D.P.'s trafficker would force her to follow his orders at gun point. In addition, her trafficker was extremely violent with her at this location. Loud sounds of abuse, yelling, and T.D.P.'s screams for help would have been obvious to the hotel staff and other guests.

51.     A few of the Park Quality Inn by Choice employees solicited the other victims being trafficked with T.D.P. for commercial sex.

52.     The Park Quality Inn by Choice staff formed a relationship with T.D.P.'s trafficker. T.D.P. remembers the staff regularly giving her trafficker free night stays at the Park Quality Inn by Choice.

53.     T.D.P.'s trafficker always paid in cash and was never required by the Park Quality Inn by Choice staff to show their identification documents.

54.     T.D.P. attempted to escape her trafficker at this location but was never successful. During one stay, T.D.P. attempted to escape her trafficker while in public areas of the Park Quality Inn by Choice. These attempts would have been captured by security camera footage.

55.     T.D.P. remembers the police regularly patrolling at the Park Quality Inn by Choice for trafficking, prostitution, and drug activity.

56.     One of the other victims trafficked with T.D.P. would regularly go to the front desk to request clean linens multiple times throughout their stay at the Park Quality Inn by Choice.

57.     The foot traffic of "johns" coming in and out of the room throughout the day and night was obvious. Each time T.D.P. or one of the three victims she was trafficked with had a customer, the "john" would enter the room and the three victims would leave and wait in the common areas until the "john" left. This process repeated at all hours. The "johns" and victims coming and going, as well as three victims waiting in the common areas of the hotel would have been obvious to the Park Quality Inn by Choice staff. This foot traffic was captured by security cameras placed throughout the hotel.

58.     Further, with each stay at the Park Quality Inn by Choice, it resulted in several consistent red flags, including, but not limited to: Paying for stays in cash; Paying for extended stays on a day-by-day basis; Obvious signs of illegal drug use; Frequent requests for linen changes; Unusually large number of used condoms in the trash; Unusually large number of male visitors coming in and out of the hotel room; and women wearing clothing inappropriate for the weather.

59.     Plaintiff was repeatedly raped and otherwise sexually abused hundreds of times at the Park Quality Inn by Choice.

60.     These red flags were open and obvious to anyone working at the Park Quality Inn by Choice for two months.

**THE SEX TRAFFICKING OF T.D.P. AT THE DAVIDSON QUALITY INN**

61.     Plaintiff T.D.P. was subjected to sex trafficking at the Choice branded, Davidson Quality Inn located at 7325 Davidson Pkwy N, Stockbridge, GA 30281.

62.     Plaintiff and her trafficker stayed at the Davidson Quality Inn by Choice from approximately March to April 2018, staying twice a week within this period.

63.     T.D.P.'s trafficker was very violent with her at the Davidson Quality Inn by Choice, and loud sounds of abuse and T.D.P.'s screams for help could often be heard from the room.

64.     During one stay at the Davidson Quality Inn by Choice, one of the other victims trafficked with T.D.P. and a "john" got into a fight. The "john" went to the front desk staff and told them human trafficking was happening at the hotel. However, the staff did nothing to respond and did not involve law enforcement.

65.     At the Davidson Quality Inn by Choice, the hotel staff solicited the other victims trafficked with T.D.P. for commercial sex.

66.     The foot traffic of "johns" coming in and out of the room throughout the day and night was obvious. Each time T.D.P. or one of the three victims she was trafficked with had a customer, the "john" would enter the room and the three victims would leave and wait in the common areas until the "john" left. This process repeated at all hours. The "johns" and victims coming and going, as well as three victims waiting in the common areas of the hotel would have been obvious to the Davidson Quality Inn by Choice staff. This foot traffic was captured by security cameras placed throughout the hotel.

67.     Further, with each stay at the Davidson Quality Inn by Choice, it resulted in several consistent red flags, including, but not limited to: Paying for stays in cash; Paying for extended stays on a day-by-day basis; Obvious signs of illegal drug use; Frequent requests for linen changes; Unusually large number of used condoms in the trash; and unusually large number of male visitors coming in and out of the room.

68.     Plaintiff was repeatedly raped and otherwise sexually abused hundreds of times at the Davidson Quality Inn by Choice

69.     These red flags were open and obvious to anyone working at the Davidson Quality Inn by Choice and lasted continuously for two months.

### THE SEX TRAFFICKING OF T.D.P. AT THE SMYRNA COMFORT INN

70.     Plaintiff T.D.P. was subjected to sex trafficking at the Choice branded, Smyrna Comfort Inn located at S 1221 Corporate Plaza SE, Smyrna, GA 30080.

71.     Plaintiff and her trafficker stayed at the Smyrna Comfort Inn by Choice from approximately March to April 2018, staying twice a week within this period.

72.     During one stay at the Smyrna Comfort Inn by Choice, T.D.P. ran away from her trafficker through the hallway. T.D.P.'s trafficker chased her into the elevator and dragged her back through the hallway and back into their room while T.D.P. screamed loudly for help. Eventually, T.D.P.'s friend opened the door to the room and T.D.P. and her friend escaped through an exit in the stairwell. All of this was likely captured by the security cameras.

73.     T.D.P.'s trafficker was very violent with her at the Smyrna Comfort Inn by Choice, and loud sounds of abuse and T.D.P.'s screams for help could often be heard from the room.

74.     The frequent foot traffic of "johns" coming in and out of T.D.P.'s room was obvious at all hours of the day. Security cameras placed in public areas captured the stream of males, who were significantly older than T.D.P., coming and going from her room to sexually exploit her.

75.     Further, with each stay at the Smyrna Comfort Inn by Choice, it resulted in several consistent red flags, including, but not limited to: Paying for stays in cash; Paying for extended stays on a day-by-day basis; Obvious signs of illegal drug use; Frequent requests for linen changes;

Unusually large number of used condoms in the trash; Unusually large number of male visitors coming in and out of the room; and Women wearing clothing inappropriate for the weather.

76.     Plaintiff was repeatedly raped and otherwise sexually abused hundreds of times at the Smyrna Comfort Inn by Choice.

77.     These red flags were open and obvious to anyone working at the Smyrna Comfort Inn by Choice and lasted continuously for two months.

## CHOICE'S KNOWLEDGE OF SEX TRAFFICKING AT THEIR LOCATIONS

78.     Choice is aware that the hospitality industry is a major life source of the human trafficking epidemic both in the U.S. and abroad.[9] The United Nations,[10] international non-profits,[11] and the U.S. Department of Homeland Security,[12] have documented this well-known epidemic of human trafficking for years and brought particular attention to the indispensable role of hotels. Choice cannot help but be aware of the public outcry against human trafficking, especially when so much of the uproar surrounds their industry.

79.     For example, in 2004 End Child Prostitution and Trafficking ("ECPAT-USA") launched the Tourism Child-Protection Code of Conduct (the "Code") in the United States, identifying the steps companies would need to take to prevent child sex trafficking. ECPAT-USA

---

[9] Giovanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

[10] *Global Report on Trafficking in Persons,* UNITED NATIONS OFFICE ON DRUGS AND CRIME (2020), 84 8available at https://www.unodc.org/documents/data-and-analysis/tip/2021/GLOTiP_2020_15jan_web.pdf; See also *We must act together to fight exploitation and human trafficking in tourism, say United Nations and international partners,* UNITED NATIONS OFFICE ON DRUGS AND CRIME (April 24, 2012) available at https://www.unodc.org/unodc/en/press/releases/2012/April/we-must-act-together-to-fight-exploitation-and-human-trafficking-in-tourism-say-united-nations-and-international-partners.html

[11] The Polaris Project and ECPAT-International have published extensive reports and professional toolkits on human trafficking in the hospitality industry for years.

[12] Human Trafficking and the Hospitality Industry, U.S. DEPARTMENT OF HOMELAND SECURITY (2020), available at https://www.dhs.gov/blue-campaign/hospitalityindustry; Hospitality Toolkit, U.S. DEPARTMENT OF HOMELAND SECURITY (2016), available at https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf

identified hotel-specific best practices for preventing sex trafficking, such as: (1) not renting by the hour; (2) not permitting cash payments; (3) monitoring online sex ads such as Craigslist and Backpage for their hotel name and pictures of the rooms; (4) changing Wi-Fi passwords in rooms and cafes regularly; (5) watching for a trend of visitors to the same room; (6) being aware of rooms with excess condoms, lubricants, and towels; (7) requiring all visitors to be logged, including guest name, visitor name, arrival time, departure time, and room number.

80.     Further, nationwide campaigns have recognized the issue of human trafficking in the hotel industry and the lack of internal policies to address the issue and took initiative as early as 1997 with the United Nations Blue Heart Campaign[13] and domestically in 2010 with the Department of Homeland Security's Blue Campaign.[14] These efforts sought to educate both the public and private sectors on identifying and combatting human trafficking, including the hospitality industry and both campaigns released free online resources and toolkits publicly accessible to any entity concerned with human trafficking.

81.     Choice, on information and belief, has access to individual hotel location do-not-rent ("DNR") lists that often list reasons for the refusal to rent, including the suspicion of human trafficking.  Choice nevertheless does not share such information with other hotel locations, thereby preventing other of their hotel locations from acting to protect the victims of such suspected human traffickers.

---

[13] *The Blue Heart Campaign,* UNITED NATIONS (2022), https://www.unodc.org/blueheart/#:~:text=The%20Blue%20Heart%20Campaign,help%20prevent%20this%20heinous%20crime.
[14] *DHS Blue Campaign Five Year Milestone*, DEP'T OF HOMELAND SECURITY (Jul. 22, 2015), https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone.

82.     Choice also has access to public police reports, news reports and internal reports generated by customers and employees, regarding sex trafficking at their own hotel locations in particular.

83.     Choice has access to reviews left by guests on websites such as www.tripadvisor.com, www.yelp.com, www.google.com, and others, wherein guests frequently complain about the prevalence of obvious prostitution, hearing physical violence by pimps, and other signs of human trafficking.

84.     A brief examination of just a handful of examples for Choice suffices to show the extraordinary frequency with which Choice has long received and continues receiving evidence and reports that human trafficking runs rampant at their hotel locations:

> a.  Regarding a stay in 2021 at the Davidson Quality Inn, a hotel customer wrote a review saying, "This is a great place, If you are looking to get robbed, buy heroine or sleep with that warm excited feeling you get when you sleep somewhere and might wake up with one of kidneys harvested. I personally loved the vending machine that says ice cold but then dishes out open warm sodas. It's extremely convenient with round the clock crack heads patrolling the outdoors and hookers offering services late into the evening. Honestly, all this 80s bad roadtrip movie location missing is the key antagonist destroying your vehicle while you're sleeping. Even if you're exhausted from driving 12+ hours straight, I would recommend sleepily driving into oncoming traffic before making the mistake of staying at what I have lovingly dubbed "comfort inn at hookers cove & heroine emporium"

b. In 2012, a prostitution sting occurred at another Comfort Inn in Smyrna, Georgia close to the Smyrna Comfort Inn by Choice.[15]

c. In 2017, two prostitution arrests were made at a Comfort Inn in Atlanta, Georgia near the Choice Branded Georgia Properties. These arrests were part of an FBI operation that made over 60 arrests at hotels in Georgia for trafficking and prostitution.[16]

### CHOICE FACILITATED THE TRAFFICKING OF T.D.P.

85. Choice is a signatory of the Code[17] and thereby has promised to adopt these policies to combat trafficking. Yet, Choice has failed to implement most, if not all these policies, and continues to unlawfully benefit from the trafficking on their properties.

86. Choice is a face and signatory to the ECPAT anti-trafficking knowledge, guidance, and information necessary to prevent human trafficking, and Choice publicly committed to participate in the programs shown to assist in identifying and preventing sex trafficking inside its brand hotels. Therefore, Choice should not only have created effective Brand standards for implementation, mandates, and operations, but also enforced them.

87. Choice profited from the sex trafficking of Plaintiff T.D.P. Choice rented rooms to and provided Wi-Fi to T.D.P.'s trafficker when they knew, or should have known, that human trafficking was prevalent within their branded properties and at the Choice Branded Georgia Properties by Choice where T.D.P. was trafficked. The hotel staff, especially front desk staff, at

---

[15] Sydney Busby, *Smyrna Police Uncover Drugs, Stolen Gun After Prostitution Sting at Smyrna Hotel,* PATCH (July 18, 2012) https://patch.com/georgia/smyrna/smyrna-police-uncover-drugs-stolen-gun-after-prostitu1ef101edda
[16] Will Peebles, *FBI sex trafficking operation leads to two prostitution arrests in Pooler,* SAVANNAH NOW (October 24, 2017) https://www.savannahnow.com/story/news/2017/10/24/fbi-sex-trafficking-operation-leads-two-prostitution-arrests-pooler/13855909007/
[17] *See Our Code Members,* ECPAT, https://www.ecpatusa.org/code-members

the Choice Branded Georgia Properties by Choice knew or should have known of the obvious signs of T.D.P.'s trafficking.

88.    Choice benefited from the steady stream of income that T.D.P.'s trafficker and "johns" bring to their hotel brands. Choice profited from each and every room that T.D.P.'s trafficker and customers rented where T.D.P. was harbored and maintained for the purpose of sex trafficking. In addition, Choice profited from data collected each and every time T.D.P.'s trafficker and customers used Choice's Wi-Fi to advertise and solicit T.D.P. for commercial sex.

89.    Choice has made a public commitment to combat human trafficking, and thus, is aware that trafficking is a common problem in the hospitality industry. Choice should have been aware of the benefits they were receiving from the human trafficking occurring at the Choice Branded Georgia Properties by Choice where T.D.P. was trafficked given Choice's access to information, such as police reports, news articles, complaints, and negative reviews regarding the specific locations and surrounding areas.

90.    Moreover, Choice repeatedly collected data on T.D.P., her trafficker, and her "johns" from her many stays at the Choice Branded Georgia Properties by Choice, including but not limited to room reservations, identification and payment information, data from websites visited on Wi-Fi, and other guest data. Choice's employees witnessed the obvious signs of T.D.P.'s trafficking including signs of abuse, frequent male visitors coming in and out of the room, condoms in the trash, loud yelling and fighting, and others. Despite having access to all this information for years, Choice failed to take reasonable measures to stop benefitting from sex trafficking occurring in their hotels. If Choice would have taken proper measures, Choice would not have profited from T.D.P. and other victims like her being trafficked at their locations.

91. Choice discussed, developed, and implemented uniform policies and procedures to identify, prevent and mitigate the risk of human trafficking occurring at their properties, including the Choice Branded Georgie Properties where T.D.P. was trafficked. These policies included ongoing communication with its local hotels by including articles about human trafficking in newsletters, announcements at annual conferences, alerts to hotels in high-risk areas or in proximity to high-risk events, and field-based associates who visit hotels specifically to discuss human and sex trafficking issues.

92. Pursuant to these policies, Choice's employees and property management regularly reported customer data and other indicators of trafficking including suspicious criminal activity, web data indicating use of commercial sex websites, and data associated with reservations. The staff at the Choice Branded Georgie Properties where T.D.P. was trafficked and reported this to Choice or would have if Choice did not fail to institute reasonable policies and procedures.

93. In addition, Choice had access to much of this data through the management of centralized data systems it required the branded properties to use, including but not limited to the property management, booking, credit processing, and information technology and internet systems.

94. Choice failed to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to stop reaping the benefits of sexual exploitation on their properties. Choice maintained their deficiencies to maximize profits by:

    a. Failing to mandate and minimizing costs of training employees and managers on how to spot the signs of human trafficking and sexual exploitation;

    b. Lowering operating costs and management costs by failing to analyze the data they received regarding criminal activity and customer reviews that indicated

sex trafficking was occurring and taking the steps necessary to remedy the problems;

c.  Collecting and utilizing massive amounts of data from all of their branded locations for marketing and other profit-driven purposes but failing to utilize this same data to combat sex trafficking in their hotels;

d.  Failing to refuse room rentals, or report guests to law enforcement, in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex traffickers or buyers;

e.  Failing to monitor and track guest wireless network use for illicit commercial sex purposes or digital activity associated with human trafficking.

f.  Failing to institute proper security measures, including, but not limited to, employing qualified security officers or appropriate cybersecurity measures to actively combat human trafficking and sexual exploitation; and

g.  Failing to use its power as a parent company hold the franchisees accountable for contributing to the prevalence of sex trafficking on their properties.

95.  As a direct and proximate result of these egregious practices on the part of Choice, T.D.P. and victims of sex trafficking and exploitation like her, have been permanently injured and damaged physically, emotionally, psychologically, and financially.

### CHOICE'S CONTROL OVER ITS BRAND HOTELS

96.  Upon information and belief, it is a standard practice in the hospitality industry, followed by Choice, for parent companies to set exacting brand quality standards reaching everything from the temperature at which coffee shall be served, to the number of pillows that shall be placed on each bed, to the types of funds accepted, to when, where and how guests should

be greeted.

97.     Choice provides their branded properties with signage on and in front of the building intended to assure customers that, if they check into that hotel, they can expect an experience consistent with the standards of the parent hotel brand.  The same brand is emblazoned on everything in the hotel, from the pens on the bedside table to the staff uniforms at the front desk.

98.     Choice provides their branded properties brand name recognition, a marketing campaign, and hotel listings in the Global Distribution System (GDS) and other online travel agency databases, as well as with access to their brand-wide central reservation systems, 800 numbers, revenue management tools, brand loyalty programs, and company websites.  Thus, booking and room reservations are to a substantial extent controlled by Choice.[18] Choice sees booking and reservation trends, including for the Choice Branded Georgia Properties by Choice where Plaintiff was trafficked.[19]

99.     Upon information and belief, Choice requires its branded hotel properties to use a property management system, which is linked to Choice's corporate network and data center, for, among other things, receiving reservations, and processing credit card transactions.

100.     Upon information and belief, per the relevant franchise agreements,[20] Choice may enforce their brand standards by means of periodic inspections of their brand hotel locations, backed up with the ultimate threat of termination of the franchise agreement.

101.     Choice exercises day-to-day control over the Choice Branded Georgia Properties by Choice and its other brand hotels through centralized corporate systems, training, policies, and

---

[18] Ellen Meyer, *The Origins and Growth of Franchising in the Hotel Industry*, LODGING MAGAZINE (Apr. 10, 2018), https://lodgingmagazine.com/the-origins-and-growth-of-franchising-in-the-hotel- industry/.
[19] Where a branded hotel allows cash to be accepted for payment, monitoring and auditing these trends are important to identifying locations where criminal activity and commercial sex trafficking may be occurring.
[20] Most franchise disclosure documents, which outline the policies and procedures of franchise agreements, can be accessed publicly for free by making an account on https://fddexchange.com/view-fdd-docs.

brand standards. Choice implements and retains brand hotel control over, including control over the Choice Branded Georgia Properties by Choice, as either direct subsidiaries or under the terms of its franchise agreements.

102.    Upon information and belief, Choice controls the operations of its branded properties through a variety of means enforced through franchise agreements and related contracts, including but not limited to:

    a.  Requiring the branded locations to use Choice's property management system;

    b.  Gathering reports of data generated by branded locations including reservation, payment, and occupancy information through Choice's centralized systems;

    c.  Requiring branded locations to keep audit reports and other records;

    d.  Conducting regular inspections for compliance with franchise agreement terms and Choice's rules and regulations;

    e.  Providing marketing requirements and standardized marketing services for the branded locations;

    f.  Regulating the all the policies, procedures, and standards of the branded properties from the front desks to the bathrooms;

    g.  Requiring branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

    h.  Requiring branded locations to install Choice's data transport system to share data with Choice corporate;

    i.  Providing training and orientation materials for branded property staff;

j. Requiring branded locations to make modifications to the branded properties upon Choice's request and to refrain from make substantial changes to the branded property without Choice's permission;

k. Regulating the rates for room rentals; and

l. Insurance coverage requirements.[21]

103. Choice manages corporate and branded property training, policies, and procedures on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, and/or other hotel brand related policies published and communicated via property management systems with back-end management by Choice.[22]

104. Choice controls uniform and required reservation, marketing, customer support systems and loyalty programs at its branded hotels through national press releases, newsletters, emails, announcements on Choice's website, and mentions across its corporate media channels.[23]

105. Choice mandates usage of a cloud-based centralized property management system called ChoiceADVANTAGE to its branded locations.[24]

106. Choice controls all hotel reservations made across its branded locations on its centralized reservation system called Choice Edge.[25]

107. Through its national sales team, Choice controls the credit processing system and the centralized direct billing at its brand hotels, including the Choice Branded Georgia Properties

---

[21] See e.g. Comfort Inn 2020 Franchise Disclosure Document, https://fddexchange.com/view-fdd-docs/comfort-inn-2020-fdd-franchise-information-costs-and-fees/
[22] *See* e.g. *Why Choice?*, CHOICE, https://choicehotelsdevelopment.com/why-choice (last visited Jun. 9, 2022). id. ("We've taken our teams' collective knowledge of hotel operations, technology, service and leadership, and developed the tools and resources our owners use every day to help run their businesses.").
[23] *Id.*
[24] *Connect the world through the power of hospitality*, CHOICE, https://www.choicehotels.com/about
[25] *Supra* n 101

by Choice.[26]

108.    Choice gathers data from its customers including names, payment information, reservation history, browsing data, other details associated with their stay for promotional and guest safety reasons.[27]

109.    Upon information and belief, Choice requires its hotels to carry Wi-Fi internet access with certain cybersecurity measures in place which gives Choice the ability to access, monitor, and harvest that internet data.

110.    Under the guise of maintaining its "brand standards," Choice also forces its branded hotels to frequently undertake expensive renovations, remodeling, and construction efforts, as well as purchase mandated products with limited warranties which are shortened by such onerous and exorbitant requirements.[28]

111.    Choice requires branded properties to comply with its corporate policies relating to Security and Guest Safety, Human Rights, Ethics, Corporate Governance, and compliance with the law.[29]

**CAUSES OF ACTION**

**COUNT 1: 18 U.S.C. § 1595 ("TVPRA")**
**(AGAINST CHOICE)**

112.    Plaintiff incorporates each foregoing allegation.

113.    Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591(a) and is entitled to bring a civil action under 18 U.S.C. §1595.

---

[26] *Id.*
[27] Choice Hotels International, Inc. *Privacy & Security Policy,* https://www.choicehotels.com/legal/privacy-policy
[28] *See e.g.*, *Convert an Existing Hotel*, CHOICE HOTELS, https://choicehotelsdevelopment.com/ convert-a-hotel/#upscale (last visited Jun. 9, 2022).
[29] Choice claims to "strive to conduct [its] business operations free from violations of human rights" *See Human Rights Policy*, CHOICE HOTELS, https://www.choicehotels.com/about/responsibility/human-rights-policy (last visited Jun. 6, 2022).

114.    Choice's acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. § 1595. Specifically, Choice had a statutory obligation not to benefit financially or receive anything of value from a venture that they knew, or should have known, engaged in violating the TVPRA. At all relevant times, Choice breached this duty by facilitating violations of the TVPRA through their participation in the harboring, maintaining, soliciting, and advertising of Plaintiff and her trafficker for the purposes of commercial sex induced by force, fraud, or coercion.

115.    Choice has benefited as a result of these acts, omissions, and/or commissions by renting rooms and providing Wi-Fi to traffickers and customers, keeping operating costs low, maintaining the loyal customer base that fuels the supply and demand of sex trafficking, and limiting mandatory regulations. Moreover, on each occasion they received payment for rooms or received payments or kickbacks for internet usage, Choice directly benefitted from the sex trafficking of Plaintiff when they knew or should have known violations of §1591(a) were occurring. The actions, omissions, and/or commissions alleged in this pleading were the "but for'" and proximate cause of Plaintiff's injuries and damages.

116.    Plaintiff has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at the Choice Branded Georgia Properties.

## COUNT 2: 18 U.S.C. § 2255(A) CHILD ABUSE VICTIMS RIGHTS ACT ("CAVRA") (AGAINST CHOICE)

117.    Plaintiff incorporates each forgoing allegation.

118.    Plaintiff was a "minor" pursuant to 18 U.S.C. § 2255(a) when she was trafficked.

119.    Plaintiff was the "victim" of violations of 18 U.S.C. §§ 1589, 1590, and 1591.

120.    Plaintiff suffered "personal injury" pursuant to 18 U.S.C. § 2255(a) as a result of those violations.

121.     Plaintiff was a "person" who "has not attained the age of 18 years" pursuant to 18 U.S.C. § 1591(a)(2).

122.     Choice knew or should have known that means of force, threats of force, fraud, coercion, or any combination of those means would be used to cause Plaintiff to engage in a commercial sex act, pursuant to 18 U.S.C. § 1591(a)(2).

123.     Choice knowingly recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, and/or solicited Plaintiff, pursuant to 18 U.S.C. 1591(a)(1), by providing her and her trafficker rooms in hotels and Wi-Fi used advertise Plaintiff and solicit customers affecting interstate commerce where authorities were unlikely to discover the injuries being sustained by Plaintiff.

124.     Choice knowingly benefited, financially or by receiving anything of value, from participation in ventures of renting rooms and providing Wi-Fi that recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, and/or solicited Plaintiff to engage in commercial sex acts.

125.     Wherefore, by reason of the foregoing, Choice is jointly and severally liable to Plaintiff for compensatory damages and for punitive damages, in the amount to be determined at trial, together with interest and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment as follows:

a.     Awarding Plaintiff all available compensatory damages for each cause of action, including but not limited to past and future medical expenses; past and future lost wages and loss of earning capacity; past and future emotional distress; consequential and/or special damages; all available noneconomic damages, including but not limited to pain, suffering, and loss of enjoyment of life;

    b.       Disgorgement of profits obtained through unjust enrichment;

    c.       Restitution;

    d.       Statutory and/or treble damages, where available;

    e.       Punitive damages;

    f.       Attorneys' fees and expenses;

    g.       The costs of this action;

    h.       Pre- and post-judgment interest; and

    i.       Any other relief the Court or jury deems appropriate.

## **JURY DEMAND**

Plaintiff hereby demands a trial by struck jury.

Dated: October 28, 2022

Respectfully submitted,

*/s/ Steven C. Babin, Jr.*
Steven C. Babin, Jr. (0093584)
Jennifer J. El-Kadi (00100660)
Kristina Aiad-Toss (0101336)
Morgan Harper (*pro hac vice forthcoming*)
**Babin Law, LLC**
65 East State Street, Suite 1300
Columbus, Ohio 43215
T: 614-761-8800
E: steven.babin@babinlaws.com
Jennifer.elkadi@babinlaws.com
Kristina.aiad-toss@babinlaws.com
Morgan.harper@babinlaws.com